UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HILDA L. SOLIS,[1] <br>   Secretary of Labor, <br>   United States Department of Labor, <br><br>               Plaintiff, <br><br>           v. <br><br> CHICAGO, ILLINOIS LOCAL OF THE <br> AMERICAN POSTAL WORKERS UNION, <br><br>             Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Civil Action No.: <br> )     1:06-cv-1640-JBZ <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## **CERTIFICATION OF ELECTION**

The election having been conducted in the above matter under the

supervision of the Secretary of Labor, United States Department of Labor, pursuant to a

Stipulation of Settlement and Order filed February 15, 2008, in the United States District

Court for the Northern District of Illinois, Eastern Division, in accordance with the

provisions of Title IV of the Labor-Management Reporting and Disclosure Act of 1959

(29 U.S.C. § 481 et seq.) and in conformity with the Constitution and Bylaws of the

defendant labor organization, insofar as lawful and practicable.  Having received

complaints, which were investigated and found to have no merit concerning the conduct

thereof, therefore:

---

[1] This action was originally brought by Elaine L. Chao, former Secretary of Labor, Successor Hilda L. Solis is automatically substituted as party in accordance with Rule 25(d), Federal Rules of Civil Procedure.

Pursuant to Section 402(c) of the Labor-Management Reporting and

Disclosure Act of 1959 (29 U.S.C. § 482(c)), and the authority delegated to me,

**IT IS HEREBY CERTIFIED** that the following named candidates are

duly elected to the offices designated:

| | |
|---|---|
| Michael J. Myles | President |
| Frank Wilson | Vice President |
| Cynthia Johnson | Secretary Treasurer |
| Michelle Elliott | Director of Industrial Relations |
| John T. Rudd | Director of Legislation |
| Essagquena Harris | Director of Organization |
| Michelle Johnson | Director of Research and Education |
| Tamala Dreux | Director of Human Relations |
| Glenda E. Harris | Clerk Craft Director |
| Jacqueline Chambers-Williams | Clerk Craft Assistant Director "A" |
| Lisa Johnson | Clerk Craft Assistant Director "B" |
| Eva Batiste-Culbertson | Clerk Craft Trustee |
| John Alexander | Motor Vehicle Craft Director |
| Matthew Murphy | MVS Assistant Director Operations |
| Charlie Scott | MVS Assistant Director Maintenance |
| Jerome Johnson | MVS Trustee |
| Kenneth C. Allen | Maintenance Craft Division Director |
| Sherry D. Dumas | Maintenance Craft Assistant Director |
| Curtis Rockett | Maintenance Craft Trustee |

Attached herewith is a Declaration setting forth the protests concerning

allegations that violations allegedly occurred during the conduct of the election and the

findings of any investigation of the protest.

Signed this 12th day of May, 2009.

_____
Cynthia M. Downng, Chief
Division of Enforcement
Office of Labor-Management Standards
Employment Standards Administration
United States Department of Labor

2

<u>DECLARATION OF CYNTHIA M. DOWNING</u>

I, Cynthia M. Downing, am the Chief of the Division of Enforcement, Office of Labor-Management Standards (OLMS), Employment Standards Administration, United States Department of Labor (Department). Pursuant to a Stipulation of Settlement and Order filed in the United States District Court for the Northern District of Illinois, on February 15, 2008, OLMS supervised the mail ballot election conducted by the Chicago, Illinois Local of the American Postal Workers Union (APWU) that concluded on May 2, 2008. Said election was conducted for the offices of President, Executive Vice President, Secretary-Treasurer, Director of Industrial Relations, Director of Legislation, Director of Organization, Director of Research and Education, Director of Human Relations, Director Clerk Craft Division, Assistant Director "A" Clerk Craft Division, Assistant Director "B" Clerk Craft Division, Trustee Clerk Craft Division, Director Motor Vehicle Craft Division, Assistant Director Operations Motor Vehicle Craft Division, Assistant Director Maintenance Motor Vehicle Craft Division, Trustee Motor Vehicle Craft Division, Director Maintenance Craft Division, Assistant Director Maintenance Craft Division, and Trustee Maintenance Craft Division.

Members of the Chicago, Illinois Local of the APWU (local) filed pre-election protests and post-election protests with OLMS alleging that Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (Act or LMRDA), 29 U.S.C. §§ 481- 484, was violated during the conduct of the supervised election. OLMS investigated the allegations. As a result of this investigation as presented herein, I find that the evidence does not provide an adequate basis for concluding that a violation of the Act occurred that may have affected the outcome of the supervised election.

By letter dated March 6, 2008, complainant Michael Myles, the successful candidate for president, filed a pre-election protest with OLMS alleging that the landlord-tenant relationship between the incumbent president and two members of the local's election committee constituted a conflict of interest. In further support of this allegation, Myles stated that the members had contributed to the incumbent's campaign in the past and permitted him to use their home to prepare partisan campaign literature during the supervised election. Section 401(c) of the Act, 29 U.S.C. § 481(c), requires that labor organizations provide adequate safeguards to ensure a fair election. Thus, an election of union officers must be circumscribed by a general rule of fairness. *See* 29 C.F.R. § 452.110. Pertinent here, the investigation did not disclose that the election committee members showed a preference for the incumbent president or that they engaged in disparate treatment while executing their duties as members of the election committee. Thus, the incumbent president's relationship with the members did not afford him an unfair advantage over other candidates. Further, unless restricted by constitutional provisions to the contrary, union officials and employees retain their rights as union members to participate in the affairs of the union, including supporting a particular candidate or a political faction in an election of union officers. 29 C.F.R. § 452.76. The local's constitution and bylaws do not contain any such restriction. Thus, the election committee members were not prohibited from engaging in campaign activity supportive of the incumbent president. Neither the Act nor the local's constitution and bylaws were violated.

By letter dated March 24, 2008, complainant Raymond Thomas, Sr. filed a pre-election protest with OLMS alleging that the Myles slate was afforded an unfair advantage over other candidates in that a locked bulletin board located at an employer facility contained campaign literature supportive of the Myles slate, but Thomas was unable to access the bulletin board.

2

Section 401(g) of the Act, 29 U.S.C. § 481(g), prohibits use of employer funds to promote the candidacy of any person. This provision's prohibition includes any thing of value contributed to promote the candidacy of any individual in an election. Thus, candidates may not use an employer facility to assist them in campaigning unless such assistance is afforded to all candidates. The investigation disclosed that, on March 24, 2008, the election supervisor received a telephone call from Raymond Thomas, Sr. alleging that Myles' campaign materials were posted at the motor vehicle garage facility in a locked bulletin board. The election supervisor immediately contacted Myles, and he admitted to using the union's bulletin board at that facility to post his campaign materials. Myles retained the one key to the lock on the board and, thus, the board was not accessible to other candidates. Thus, section 401(g) of the Act was violated when Myles used a bulletin board located at an employer facility to campaign and other candidates were not afforded similar access to the board for that purpose. The investigation disclosed, however, that after the election supervisor contacted Myles on March 24, he immediately complied with her instructions and unlocked the bulletin board to allow other candidates access to the board. Later that day, complainant Thomas informed the election supervisor that the board had been unlocked and that he was able to post campaign materials on it. The investigation disclosed that opposition candidates were provided access to the board within hours after Myles posted his materials on the board. Thus, any advantage Myles may have gained over other candidates when the bulletin board contained only his campaign materials was negligible. Thus, no violation of the Act occurred that may have affected the election outcome.

By letter dated March 28, 2008, complainant Diane T. Slaughter filed a pre-election protest with OLMS alleging that a union steward campaigned for the Anderson slate while the

steward was conducting a training session at an employer's facility. The allegation was substantiated by the investigation. Section 401(g) of the Act, 29 U.S.C. § 481(g), prohibits the use of union and employer funds to promote the candidacy of any person. Thus, employees may not campaign while being paid by the union or by the employer. Nor may candidates use a union facility or an employer facility to assist them in campaigning unless all candidates are allowed to do so. Therefore, section 401(g) of the Act was violated when the steward campaigned while being paid by the union and while he was conducting a training session at an employer facility. However, the investigation disclosed that, of the six individuals who attended the training session, only four of them were members of the local. The smallest vote margin for a race won by a member of the Anderson slate was 16 votes. Thus, even if all four of these members were eligible voters and voted in the election, these four votes could not have affected the outcome of the election.

Complainant Frank Wilson filed a pre-election protest with OLMS on March 28, 2008, concerning a postal employee's removal of a lock from Wilson's work locker. The investigation disclosed that this incident was unrelated to the election and that it did not impinge on any union member rights secured under the union officer election provisions of the Act. The Act was not violated.

By letter dated April 4, 2008, complainant Vanessa Merrill-Abrons filed a pre-election protest with OLMS alleging that the incumbent president, Samuel Anderson, along with members of his slate campaigned inside the Irving Park Road postal facility. The allegation was substantiated by the investigation. Section 401(g) of the Act, 29 U.S.C. § 481(g), prohibits the use of union or employer funds to promote a person's candidacy. Thus, section 401(g) of the Act was violated when the incumbent president and members of his slate who were not

4

employed at the Irving Park Road postal facility campaigned inside that facility, but similarly situated candidates were not allowed to do so. The investigation revealed conflicting evidence as to whether the candidates campaigned as a slate or campaigned individually. Anderson stated during the investigation that the candidates campaigned as individuals and not as a slate. However, a member who witnessed the campaigning stated that Anderson and members of his slate asked members to vote for the entire slate. The investigation did not uncover the name of any other member employed at the facility who witnessed campaigning that was supportive of the entire Anderson slate. The investigation disclosed that none of these candidates engaging in the prohibited campaigning were elected to office. Under these circumstances, the evidence does not provide an adequate basis for concluding that a violation of the Act occurred that may have affected the outcome of the election.

By letter dated April 4, 2008, complainant John Hall filed a pre-election protest with OLMS alleging that the incumbents were afforded an advantage over other candidates in that the election committee chairperson intentionally delayed the campaign mailings of opposition candidates. Section 401(c) of the Act, 29 U.S.C. § 481(c), provides that when a labor organization and its officers authorize the distribution of campaign literature on behalf of any candidate, similar distribution under the same conditions must be made for any other candidate if he or she requests it. *See* 29 C.F.R. § 452.67. The investigation disclosed that the local honored all requests for campaign mailings in the order in which they were received by the local's election committee chairperson. The election supervisor did not receive any complaints from opposition candidates or any other individuals regarding delays in the distribution of their campaign materials. Nor did the investigation substantiate that any such delays occurred. The Act was not violated.

5

In connection with the alleged delays in the campaign mailings, Hall further stated that the election committee chairperson was not able to answer questions regarding the procedures for conducting partial campaign mailings. The investigation disclosed that the union mailed all candidates, including Hall, a copy of the candidate instructions. The instructions specifically stated that candidates could request a mailing to a particular segment of the local or a mailing to the entire membership. The instructions also provided that the cost for a mailing to the entire membership was $300, a mailing to the clerk craft was $200, a mailing to the motor vehicle service craft was $50, a mailing to the maintenance craft was $55, and that a candidate was required to pay for the mailing at the time the candidate dropped off the materials at the union hall. The instructions further provided that anyone wishing to conduct a campaign mailing should contact the election committee chairperson at the telephone number listed on the instructions. The Act was not violated.

By letters dated, April 25, 28, and 29, 2008, complainant John Hall filed pre-election protests with OLMS alleging that his work supervisor interfered in the election when the supervisor made negative comments about Hall's candidacy. Section 401(g) of the Act, 29 U.S.C. § 481(g), prohibits the use of employer funds to promote the candidacy of any person. The investigation disclosed that Hall had been injured on the job and believed that management was not being responsive to his physical limitations. During Hall's discussion of this matter with his manager, the manager allegedly stated loudly that the he did not understand why anyone would vote for Hall. During the investigation, Hall stated that the twelve employees who were in the vicinity where the discussion took place overheard the supervisor's comment. However, Hall was unwilling to provide OLMS with the names of any of these individuals. Nor was the investigation able to uncover their names. In any event, Hall was defeated by a vote margin of

6

over 300 votes. Thus, even if the allegation was true and all twelve employees were eligible voters who voted in the election, these twelve votes did not affect the outcome of the election.

By letter dated April 18, 2008, complainant William Kinslow filed a pre-election protest with OLMS alleging that he did not receive the election rules in a timely manner and that the delay prevented him from having sufficient time to prepare a 26-page campaign mailing. The investigation disclosed that OLMS mailed complainant Kinslow a copy of the election rules on March 7, 2008, and that the ballots were mailed on April 4, 2008. Thus, Kinslow had almost one month after the mailing of the election rules to prepare his campaign materials. Also, on March 21, 2008, OLMS mailed Kinslow, along with the other candidates, information regarding campaign mailing services offered by the company that the local had secured to print the election materials. OLMS also mailed complainant Kinslow a second copy of the election rules on that date after he told the election supervisor that he had misplaced the rules. In any event, Kinslow was not required to wait until he received the election rules to prepare his campaign materials for mailing. He could have prepared the materials any time prior to his receipt of the rules. The Act was not violated.

By letters dated May 1, May 2 and May 7, 2008, election committee members Theresa Gill, Frederick Gill and Dorothea Jackson filed post-election protests with OLMS alleging that the local's constitution and bylaws require the election committee to conduct the election but that the election committee served as observers during the supervised election. The investigation failed to substantiate this allegation. The investigation disclosed that the election committee participated in nearly every aspect of the election process. For example, the investigation showed that the election committee hired the company that provided the balloting machines, coordinated the printing of the voter eligibility list with the APWU national office, recorded

7

duplicate ballot requests and faxed that information to OLMS, posted all election related notices at the work facilities and facilitated all requests for campaign mailings. Also, the election committee attended the pre-election conference at which many of the election rules and regulations were determined, attended the candidates' meeting, and observed the ballot printing and mailing and OLMS' recount of the ballots. Further, election committee chairperson Theresa Gill conducted the nominations meeting. The Act was not violated.

In addition, election committee members Theresa Gill, Frederick Gill and Dorothea Jackson alleged that the provision of the local's constitution and bylaws requiring that all printed election related materials contain a union bug was violated in that some materials did not contain such bug. The investigation disclosed that the local's constitution and bylaws do not contain any such requirement. Neither the local's constitution and bylaws nor the Act was violated.

Complainants Theresa Gill, Frederick Gill and Dorothea Jackson further alleged that election related materials that were created by OLMS and posted at the work facilities contained the wrong year. This allegation was substantiated by the investigation. The investigation disclosed that the year 2005 instead of the year 2008 was printed on the election notice as the year of the election. However, the ballots as well as the other election materials that were mailed to members contained the correct year. The investigation did not disclose the name of any member who did not vote in the election because the member was confused about the year of the election. Thus, no violation of the Act occurred that may have affected the election outcome.

Complainants Theresa Gill, Frederick Gill and Dorothea Jackson alleged that the election supervisor marked new ballots for 21 ballots that had been rejected by the tally machine. The investigation disclosed that during the vote tally 15 ballots were rejected by the tally machine. Two of these ballots were rejected because the ballots were damaged. OLMS obtained blank

8

ballots and recorded the exact votes that had been marked on the damaged ballots onto the blank ballots so that such ballots could be processed by the tally machine. In addition, 13 other ballots were rejected by the machines because they contained extraneous markings or the intent of the voter was not clear. OLMS voided only those offices on a ballot where the voter's intent could not be determined and included the remainder of the ballot in the vote tally with respect to those offices for which the voter's intent was clear. These actions allowed votes cast by eligible members to be properly included in the vote tally. There was no ballot fraud or vote tampering. The Act was not violated.

Complainants Theresa Gill, Frederick Gill and Dorothea Jackson alleged that the election supervisor included ballots in the vote tally that were enclosed in outer ballot envelopes that did not contain voter identification. This allegation was not substantiated by the investigation. The investigation disclosed that the local used a double envelope system for the return of the voted ballots. The company that mailed the ballot packages affixed the necessary voter identification to each of the outer ballot envelopes prior to the ballots being prepared for mailing. The investigation also disclosed that the two ballots that were mailed back in envelopes other than those provided in the mail ballot packages did not contain any voter identification and voter eligibility could not be verified. For that reason, such ballots were not included in the vote tally. The Act was not violated.

Complainants Theresa Gill, Frederick Gill and Dorothea Jackson alleged that candidates on the Myles slate collected ballots. To substantiate this allegation, the complainants stated that 29 voted ballots were hand delivered to the Berwyn Post Office. The investigation disclosed that the allegation was based on information the complainants had obtained from several individuals, including Kenneth Mulholland, a member of their slate. During the investigation, Mulholland

stated that he never witnessed anyone handing their voted or blank ballot to another member. Nor did any member tell Mulholland that someone had solicited the member's ballot. Although Mulholland stated during the investigation that an individual had admitted to collecting ballots, Mulholland was unwilling to provide OLMS with the name of such individual. In addition, one of the complainants stated during the investigation that Mulholland had informed the complainant that Michelle Elliot, a candidate on the Myles slate, had admitted to collecting ballots. During the investigation, Mulholland refused to confirm whether or not he had provided that information to the complainant. When questioned by an OLMS investigator, Elliot denied that she told Mulholland or anyone else that she had collected ballots. In addition, the two members that the complainants identified as having their ballots solicited denied that any such solicitation occurred or refused to discuss the matter with OLMS. Also, OLMS interviewed members employed at a postal facility where the ballot collection is alleged to have occurred. None of these members stated that someone had solicited or collected a member's ballots during the supervised election. The members of the Myles slate who allegedly engaged in ballot collection all denied participating in such activity. The evidence did not corroborate that ballot collection or other similar election irregularities occurred. The Act was not violated.

By letter dated May 5, 2008, complainant Stephanie Davis filed a post-election protest with OLMS alleging that she telephoned OLMS and reported that Michelle Elliot and Sharon Belle campaigned inside the facility where Davis works but that the election supervisor never returned Davis' telephone call. The investigation disclosed that the election supervisor maintained a daily log regarding complaints of election irregularities that she received by telephone and in writing. The log does not reflect that the election supervisor received a message from Davis concerning campaigning by Belle and Elliot. Nor did Davis file a written

10

protest with the election supervisor regarding the alleged campaigning. Further, OLMS had informed all candidates, including Davis, in a March 24, 2008 letter that anyone who witnessed campaigning inside a postal facility should contact the employer's labor relations office at the telephone number listed or contact a management representative and report the incident. The investigation disclosed that Davis never reported any incidents of campaigning to that office or management. Thus, the evidence failed to provide an adequate basis for concluding that the Act was violated.

Complainant Davis also alleged that Kenneth Mulholland informed her that Michelle Elliot, a candidate on the opposition slate, admitted to collecting ballots from members and that Larry Holmes told her that Michael Myles, the successful candidate for president, telephoned Holmes and solicited his ballot. During the investigation, Mulholland stated that he never witnessed any ballot collection or solicitation. Elliot stated during the investigation that she never told Mulholland or anyone else that she collected ballots. Holmes was unwilling to speak with OLMS investigators. There was no evidence that the Act was violated.

By letter dated May 5, 2008, Samuel Anderson, the incumbent president, filed a post-election protest with OLMS alleging that the election supervisor instructed the postal service to send out emails informing its managers that candidates were prohibited from campaigning at the postal facilities, even though the election campaign guidelines issued by the postal service permitted such campaigning. The investigation disclosed that the election supervisor did not provide any such instructions to the postal service. Rather, the election supervisor orally admonished Anderson about campaigning inside a postal facility after the election supervisor learned that an instructor at the postal training academy had made remarks supportive of the Anderson slate while conducting a training session. The Act was not violated.

11

Complainant Anderson also alleged that management asked him to leave the motor vehicle garage facility, although he was campaigning only in the break room. The investigation disclosed that the postal service election campaign guidelines provide that employees may campaign in non-work areas inside the facility at which they are employed but that a member who is on leave status from the postal service to serve in union office is prohibited from campaigning at any facility, including the one at which the officer was previously employed. The guidelines further provide that union officers are permitted inside the employer's premises only for purposes relating to the administration of the collective bargaining contract. The investigation showed that Anderson was the incumbent president and, as such, he was on leave status from the postal service to serve in union office. Thus, Anderson was prohibited from campaigning inside any postal facility, including in the break areas. In any event, the election campaign guidelines permitted Anderson to campaign outside the postal facilities in the employee parking lots and at the employee entrances of such facilities. In addition, Anderson conducted a campaign mailing to the membership and he was not prevented from conducting a targeted mailing to the members employed at the motor vehicle garage facility. The Act was not violated.

In addition, complainant Anderson alleged that his opponent, Michael Myles, received the votes of ninety-five percent of the members employed at the motor vehicle garage facility because the Anderson slate was prevented from campaigning inside that facility. The investigation disclosed that postal service election campaign guidelines provide that employees may campaign inside the non-work areas of the facility at which they are employed and that such employees are permitted to discuss election matters while on the work room floor. The investigation revealed that no supporter or member of the Anderson slate who was employed at

the motor vehicle garage facility was prevented from campaigning in the designated areas of the facility or prevented from discussing election matters while on the work room floor. Further, the slate was not prevented from campaigning outside the facility. The Act was not violated.

Complainant Anderson further alleged that the election supervisor was unresponsive to his complaints concerning the Myles slate. The investigation disclosed that the election rules that were provided to all candidates, including Anderson, expressly stated that election complaints must be submitted to the election supervisor in writing. The election supervisor also orally informed candidates of the importance of submitting written complaints to her if candidates wanted the information to be considered an official complaint. During the investigation, Anderson stated that he never submitted any written complaints against his opponent, although the election supervisor had advised him to do so. In any event, the investigation disclosed that the election supervisor followed up on the telephone voice messages she received from Anderson and any other member regarding allegations of election improprieties. Depending on the circumstances, the election supervisor contacted post office management, the labor relations representative or the person accused of engaging in the improper conduct in an effort to redress allegations of election violations. The Act was not violated.

In addition, complainant Anderson alleged that the election supervisor constantly monitored the members of his slate, while Michelle Elliot, John Alexander and Michael Myles were allowed to collect ballots from the motor vehicle garage members and vote such ballots for the Myles slate. The investigation did not disclose that the election supervisor monitored the activities of the Anderson slate any more than she monitored the activities of the Myles slate. Nor did the investigation corroborate that ballots were collected by the individuals identified by the complainant or by any other individual. The investigation did not disclose that members or

13

candidates had unsupervised custody of ballots and voted them for the Myles slate. None of the voted ballots contained a pattern of erasures for the Anderson slate and corresponding votes marked for the Myles slate, or other irregularities. The Act was not violated.

Complainant Anderson alleged that the election supervisor removed over 100 spoiled ballots from the ballot count and replaced them with new ballots that had been marked by the election supervisor. This allegation was not substantiated by the investigation. The investigation disclosed that 15 ballots that were damaged or contained extraneous markings were rejected by the tally machine. Two of these ballots were rejected by the machines because the ballots were damaged. OLMS obtained blank ballots and in the presence of observers recorded the exact votes that were marked on the damaged ballots onto the blank ballots so that such ballots could be processed by the tally machine. In addition, 13 other ballots were rejected by the machines because they contained extraneous markings or the intent of the voter was not clear. OLMS voided only those races marked on a ballot for which voter intent could not be determined and included the remainder of the ballot in the vote tally with respect to those offices for which the voter's intent was clear. The supervisor's actions properly allowed eligible voters to have their votes included in the tally. The Act was not violated.

By letter dated May 5, 2008, complainant Dianita Colvin filed a post-election protest with OLMS alleging that the election supervisor's involvement in the 2008 supervised election exceeded the scope of her authority under the settlement agreement. The investigation disclosed that the manner in which the election supervisor discharged her supervisory responsibility was consistent with the guidelines of the settlement agreement. The investigation also disclosed that the election supervisor made every effort to ensure that the election was administered in

14

accordance with the LMRDA and the local's constitution and bylaws, as mandated by the settlement agreement. The Act was not violated.

Complainant Colvin also alleged that the election supervisor personally investigated every allegation made against the Anderson slate but did nothing when Colvin complained about the Myles slate. The investigation disclosed that the election supervisor followed up on the telephone voice messages she received from members of both slates regarding allegations of election improprieties and addressed all complaints that were submitted to her in writing. There is no evidence that the election supervisor showed a preference for one slate over another slate or that she engaged in disparate treatment while acting in her supervisory capacity. The Act was not violated.

Complainant Colvin also alleged that the election supervisor told the incumbent president that the election supervisor believed that Colvin was campaigning while on work time. Even if this allegation was true, there is no evidence that the statement was intended to affect or actually affected Colvin's campaign. Further, any concerns the election supervisor may have had concerning unlawful campaigning were within the scope of her supervisory responsibilities. The Act was not violated.

In addition, complainant Colvin alleged that, in a letter dated March 24, 2008, the election supervisor restricted Colvin's work hours to 9:00 a.m. until 5:00 p.m and that such restriction impeded Colvin's ability to campaign. The investigation disclosed that during the election, the election supervisor received complaints regarding unlawful campaigning. In an effort to curtail such campaigning, the election supervisor issued supplemental election rules on March 24, 2008. The rules provided additional campaign guidelines, including that union officers and union employees were required to take vacation time or a leave of absence if they

15

intended to campaign during work hours, that any vacation time or leave had to be documented and that the union office hours were 9:00 a.m. to 5:00 p.m. The investigation disclosed that Colvin was the incumbent secretary-treasurer. During a meeting with the election supervisor, Colvin stated that she was on union duty 24 hours a day and that she did not have any set work hours. As a result, the guidelines clarified the union's normal office hours and that campaigning by union officers and union employees during those hours was prohibited unless such individuals could document that they were on personal time. The guidelines did not prohibit any union officer, including Colvin, from campaigning during the union's regular office hours. The rule merely required Colvin to take documented vacation time or other leave if she intended to campaign during those hours. The Act was not violated.

Complainant Colvin further alleged that Sharon Belle and Michelle Elliot campaigned at the Greenwood Station but that the election supervisor prevented members of the Anderson slate from campaigning there. The investigation disclosed that Colvin never filed a protest with the election supervisor regarding the alleged campaigning at the Greenwood Station. Nor did Colvin contact the employer's labor relations office or a management representative and report this incident. Further, there is no evidence that the election supervisor prevented any members from engaging in permissible campaign activities. The Act was not violated.

Complainant Colvin alleged that the election supervisor ordered a labor relations supervisor to remove all election literature posted at the motor vehicle garage facility but that the next day Michael Myles posted campaign literature in a locked bulletin board located at that facility. The investigation disclosed that, with the exception of the union bulletin board, the postal service election campaign guidelines prohibit the posting of campaign literature on employer property. Pursuant to those guidelines, postal management removed campaign

16

literature that was improperly posted at a facility. The investigation further disclosed that the day after management removed the literature, Michael Myles posted partisan campaign literature in a locked union bulletin board located at the motor vehicle garage facility and that he was the only person who had a key to the lock. The investigation revealed that within hours of Myles' postings, the bulletin board was unlocked and opposition candidates were able to post campaign materials on the board. No violation of the Act occurred that may have affected the election outcome.

Complainant Colvin alleged that a national business agent campaigned at the motor vehicle garage facility. The investigation disclosed that Colvin did not file a protest with the election supervisor at the time of the alleged campaigning. Nor did she report the incident to the employer's labor relations office or to postal management. Further, Colvin did not provide and the investigation failed to uncover the name of any one at the facility who witnessed such campaigning. Under these circumstances, the evidence failed to provide an adequate basis for concluding that the Act was violated.

In a letter received by OLMS on May 8, 2008, complainant Keith M. Richardson filed a post-election protest alleging that he had been informed that several candidates in the motor vehicle craft collected ballots from members and marked them for the Myles slate. The evidence did not corroborate that such ballot collecting occurred. The investigation disclosed that the allegation was based on second hand information and statements that had been made by Kenneth Mulholland. During the investigation, Mulholland stated that he never witnessed anyone handing their voted or blank ballot to another member. Nor did any member tell Mulholland that someone had solicited the member's ballot. Members employed at the postal facility where the

17

ballot collection is alleged to have taken place stated during the investigation that no one solicited or collected their ballots. The Act was not violated.

Complainant Richardson also alleged that the ballot preparation was flawed due to changes made by the election supervisor and SOCO, the ballot association that prepared the ballots, and that those changes affected the vote tally. The investigation disclosed that each candidate was assigned a number and that SOCO's failure to properly enter these assigned numbers into its computer system during the vote tally resulted in the tally machine incorrectly showing that some candidates had received zero votes. Subsequently SOCO corrected this error and re-tabulated the votes. In order to verify the accuracy of the revised SOCO tally figures, OLMS manually recounted the ballots on May 2, 2008. Although there were minor discrepancies between the final SOCO machine count and the OLMS manual recount, these minor differences would not have affected the election outcome for any officer position. The Act was not violated.

Complainant Richardson alleged that the election supervisor improperly assigned numbers to the candidates. The investigation disclosed that the election supervisor assigned a number to each candidate only after candidates expressed a desire to have a unique number assigned to them so that candidates could use the number as an additional way of identifying themselves to members while campaigning. The Act was not violated.

Complainant Richardson alleged that candidates were disenfranchised in that the election supervisor prohibited candidates from disseminating campaign literature or posting such literature inside the postal facilities and candidates were not allowed to enter postal stations or the work room floor to campaign. The investigation disclosed that the postal service election campaign guidelines provide that employees may campaign in designated areas at the facility

18

where they are employed and that such employees may distribute campaign literature on non-work time in the break areas. Members are prohibited from campaigning inside any facility at which they are not employed. Further, with the exception of the union bulletin board, the guidelines prohibit the posting of campaign literature on employer property. The investigation disclosed that any decisions the election supervisor made concerning campaigning were consistent with the guidelines. The Act was not violated.

Complainant Richardson alleged that, at the conclusion of the April 30, 2008 vote tally, there was a ten-vote margin between him and the winner of the race for the director of industrial relations but that the vote margin was reduced to seven votes after OLMS recounted the votes. The investigation disclosed that on May 2, 2008, in response to requests from five members, OLMS recounted the votes. Specifically, in preparation for the recount, SOCO separated the ballots into four categories, including clerk, maintenance, motor vehicle craft and general. SOCO then stacked the ballots for each category into piles of 50 ballots. The recount was conducted by nine OLMS investigators who were divided into teams of three. During the recount, one investigator called out the votes marked on a ballot for each candidate while the other two investigators recorded the vote on his or her tally sheet next to the candidate's name. At the end of each stack of 50 ballots, OLMS compared the two tally sheets to ensure that both sheets contained the same number of votes for each candidate. Once it was determined that the votes on the tally sheets reconciled, the tally results were transferred to a master tally sheet and such results were used to compute the final vote tally. The investigation disclosed that OLMS' recount of the votes showed that Richardson received 441 votes and the winner received 448 votes, for a vote margin of seven votes. The machine SOCO used to tally the votes on April 30, 2008, erroneously indicated that Richardson had received 439 votes and that the winner

19

had received 449 votes, for a vote margin of ten votes. This discrepancy would explain the difference between the results of the April 30 vote tally and the results of OLMS' May 2 recount of the votes. The Act was not violated.

By letter dated May 7, 2008, complainant William Kinslow alleged that he was denied an opportunity to observe the ballot recount because the election supervisor failed to inform him of the location of the recount. Kinslow stated during the investigation that the person he spoke with on May 1, 2008, when he called the union office informed him of the date of the ballot recount, that the recount would be conducted at the OLMS office and provided him with the address of the office. Thus, even if the election supervisor inadvertently failed to inform Kinslow of the location of the ballot recount, Kinslow was provided that information by the local. He was not prevented from observing the ballot recount. The Act was not violated.

Complainant Kinslow also alleged that OLMS prevented him from mailing 5,000 campaign booklets to members. The investigation disclosed that the election rules that OLMS mailed to Kinslow informed candidates of the procedures for requesting a campaign mailing, the cost of conducting such a mailing, and that a candidate should contact the election chairperson at the telephone number listed if the candidate wished to have the local conduct a mailing on the candidate's behalf. The investigation disclosed that Kinslow never requested the local to conduct a campaign mailing on his behalf. The Act was not violated.

In addition, complainant Kinslow alleged that he received a ballot in the mail that correctly listed his nickname as "postalgate" but that he later received a ballot that incorrectly listed his nickname. The investigation disclosed that OLMS and members of the election committee observed the printing, preparation and mailing of the ballots and that the official election ballot listed Kinslow's correct nickname. The Act was not violated.

20

Finally, complainant Kinslow alleged that he did not have sufficient time to prepare his campaign materials. The investigation disclosed that the nominations notice was mailed to the membership on March 6, 2008, and that Kinslow received the notice a couple of days after it was mailed. Kinslow, therefore, was aware in early March of the impending election. Further, the ballots were mailed to members on April 4, 2008. Thus, Kinslow had almost one month prior to the ballot mailing to prepare his campaign materials for mailing. The Act was not violated.

The Department has concluded from its investigation that the election of union officers conducted by the Chicago, Illinois Local of the American Postal Workers Union, that concluded on May 2, 2008, under OLMS supervision, complied with Title IV of the Act and was conducted, insofar as lawful and practicable, in accordance with the Constitution and Bylaws of the American Postal Workers Union and the Constitution and Bylaws of the of the Chicago, Illinois Local. Therefore, no reason exists to overturn the results of this election.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 23rd day of April, 2009, in City of Washington, District of Columbia.

*eu Downing*

Cynthia M. Downing, Chief
Division of Enforcement,
Office of Labor-Management Standards,
Employment Standards Administration,
United States Department of Labor

21